IN CHATHAM SUPERIOR COURT, JULY, 1831.

JANE IRWIN *vs.* JOHN MORELL.

*Motion for New Trial.*

The only possession and enjoyment, which can divest a legal right to property, must be adverse to, and inconsistent with the title. And even an adverse possession held during the minority of the true owner cannot operate against his right.

When a person, knowing that he has title to property, stands by and suffers another to mortgage or sell it, without asserting his title, or making it known to the mortgagee or purchaser, he cannot afterwards set up his claim. And in such a case even infancy will be no protection, provided the minor had arrived at those years of discretion when a fraudulent intent could be reasonably ascribed to him.

If A. be present when an execution is levied on his property as the property of B., and does not object to the levy, or claim title in himself, a presumption arises that he has

THIS was an action of trover for ―― negroes. The case was tried the first time at ―― Term, 182-, when a verdict was rendered for the plaintiff. The defendant appealed from the verdict, and the case was again tried at ―― Term, 183-. On the part of the plaintiff one witness testified that Alexander Irwin, an uncle of the plaintiff, about the time the line was run between the State of Georgia and the Indians, under the treaty of Shoulderborne, gave to the plaintiff a negro girl, three or four years old, whose name was Hannah ;―that said Alexander Irwin brought the negro girl to the house of the late General Jared Irwin, who was the father of the plaintiff, and called for the plaintiff, who met him in the yard. He then put the hand of the girl into that of the plaintiff, and told her that he gave her that negro girl. Another witness also testified that she did not see Alexander Irwin make the gift ; but soon after he had brought the girl to the plantation of Jared Irwin, she heard him (Alexander Irwin) say that he had given the negro girl Hannah to the plaintiff. These two and other witnesses testified that said negro girl was always recognized in the family of Jared Irwin, as the property of Jane Irwin the plaintiff. Jane Irwin at the time of the gift, was a little girl, about the age of the girl Hannah. This negro Hannah and her children were the subjects of the suit. The identity of the negroes, and the conversion by the defendant were sufficiently established.

On the part of the defendant it was proved, that the negro had remained in the possession of Jared Irwin to the time of his death,―that he exercised acts of ownership over them― that in the year 1815, he mortgaged them and other negroes to James Dickson and Co.―that after the death of Jared Irwin they still remained upon his estate and with his negroes,

---

until they were sold in the year 1823 at sheriffs' sale, to satisfy the debt due to James Dickson and Co. The person who was sheriff at the time of said sale testified, that when he made the levy, he found the negroes in the possession of the family of Jared Irwin deceased, and on his plantation—did not take them away at the time of the levy—*believed* the plaintiff was present when the levy was made; did not know postively, but was under the impression that the plaintiff knew the nature of the process under which the levy was made; no person forbade him to take the girl Hannah; the negroes were sent to the court house on the day of sale by the family. One of the plaintiff's witnesses who had acted as overseer for Jared Irwin in 1807, and had continued in his service for three years, stated in his cross examination, that the negro Hannah was considered as the property of Jared Irwin, except by the family who called her Jane's property. The same witness gave an affirmative answer to the question "whether from what he saw while acting as overseer, he did not believe the said slave was the property of the estate of Jared Irwin?" There was no direct evidence that the plaintiff was cognizant of the mortgage at the time of its execution; and one witness who was examined as to that point on the part of the defendant, stated it to be his opinion that the mortgage was unknown to the family and neighbors of the mortgagor in the year 1817; that the situation of the plaintiff was such at that time, that he (the witness) could say that she knew nothing at all of the private transactions of her father and mother; and that she usually spent much of her time from home. To the question put on the part of the defendant "whether the negroes were not considered in the family as the property of Jane Irwin," the witness answered that he did not think so; and stated that John Irwin the son of Jared Irwin after the death of his father, applied to the witness to borrow a sum of money in order to keep back, (to redeem,) the negroes belonging to his sister Jane Irwin. No evidence was adduced that the plaintiff was present at the sale. The jury returned a verdict for the defendant, whereupon the counsel for the plaintiff moved for a new trial upon the following grounds.

First. Because the verdict was contrary to law and evidence.

Secondly. Because since the trial the plaintiff has discovered new and material evidence. This ground was verified by the usual affidavit of the party. The following extracts from the affidavits of Simon Whitaker and Charles Williamson will show the nature of the newly discovered evidence. "Simon Whitaker being duly sworn, deposeth and saith that he was in Saundersville, Washington County, on the first Tuesday in January, 1823, at the time that General Irwin's negroes were sold, and saw Miss Jane Irwin there, who claimed

*Marginal note:* none; but then if A. should afterwards interpose his claim according to our statute, and should produce clear and satisfactory evidence of his title, he will recover the property.

And if he should not interpose his claim, under the statute but on the day of sale should publicly forbid the sale, and assert his title in the hearing of the by-standers, he might afterwards institute an action against the purchaser who could not defend himself against a clear title by proving that the plaintiff at the time of the levy made no objection.

But if claimant fail to assert his right both at the time of levy and sale, having an opportunity of doing so, it will be regarded as a fraud on the purchaser, or such gross *laches* as will bar any future claim.

When a verdict has no foundation in the evidence, a new trial will be granted; but when there has been evidence on both sides as it is the peculiar office of the jury to determine the relative weight of conflicting evidence, the court although it may

10

CHATHAM,
July, 1831.

IRWIN
v.
MORELL.

differ with the jury on the point of preponderance, will not disturb the verdict.

It seems however, that when the verdict is glaringly against the weight of evidence, and must inevitably work injustice, a new trial, may be granted.

A new trial will not be granted upon the discovery of new testimony which is merely *cumulative.*—Though this rule has not been held inflexible, the courts will observe great caution in relaxing it.

The court reluctantly granted a new trial upon the ground of newly discovered testimony, which was not merely cumulative, in connexion with certain auxiliary circumstances attendant upon the case, it not having been satisfactorily shown that due diligence was used to obtain it sooner.

The granting of a new trial or refusing it, must depend upon the legal discretion of the court, guided by the nature and circumstances of the particular case.

a part of said negroes; that he heard her say to her brother General John Irwin that she forbid the sale of them, and that she never would consent to the sale of them—that he saw the negroes encamped with a waggon on the commons of said town; and there they remained until they went back to General Irwin's plantation; that he saw the sheriff within sale hours, standing at the court house door crying the said negroes all at once, and knocked them off to the agent of James Dickson and Co. while they were at the camp on the commons with the waggon—that he enquired of General John Irwin, what he meant by such a course of conduct— that he remarked the house of James Dickson and Co. had been kind and indulgent to him—that he wanted the case settled—that he thought it was the best he could do—that he had made a private sale—and that he wanted to perfect titles—that he (deponent) told him that his sister Jane would never consent to it. He (General Irwin) then remarked that he intended to try and satisfy her by letting her have some other property, that would suit her as well."

"Charles Williamson being duly sworn, maketh oath and saith, that to the best of his recollection, in the year 1823 or 1824, this deponent lived in Saundersville in Washington County, and that on a sheriff's sale day in one of those years above mentioned, some of the negroes belonging to the estate of Jared Irwin, deceased, were exposed to public (sale) under the foreclosure of a mortgage and there were included in said mortgage a certain woman named Hannah and her increase; and Miss Jane Irwin the daughter of said deceased, claimed said negroes, and on the day and at the hour of sale, called on this deponent to go with her to the court house where the negroes were exposed to public out-cry, and did then and there forbid the sale of said negroes, saying the negroes, to wit, Hannah and her children, were the property of her the said Jane Irwin."

*By the Convention.* The jury in rendering a verdict for the defendant, must have been governed by a conviction of the truth of some one at least of the following propositions. *First*, that the plaintiff had no title originally to the girl Hannah: or *secondly*, that she had parted with her title by some contract, or agreement with Jared Irwin her father; or *thirdly*, that she had been divested of all property in the negroes in question, by Jared Irwin's uninterrupted possession and control of them for so long a period; or *fourthly*, that she had knowledge of, and assented to the mortgage in favor of James Dickson and Co. or fraudulently concealed her title from the mortgagees; or *fifthly*, that she was apprized of, and acquiesced in the levy; or *lastly*, that she had knowledge of the intended sale and acquiesced therein; or fraudulently concealed her title from the purchaser. It is not to be presumed that the verdict of the jury is referrible in any degree

to the first of these positions. For the fact of a verbal, but explicit gift, made to the plaintiff by her uncle and perfected by actual delivery, was established by the uncontradicted testimony of a witness, who was present at the transaction; and also by proof of the acknowledgment of the donor, made a short time afterwards, that he had given the girl Hannah to his niece. Without this positive proof of the existence and origin of the plaintiff's title, perhaps even the uniform recognition of it, by the family of Jared Irwin, whilst the property remained in his possession, would have lost much of its force; but taken in connexion with the direct evidence, the recognition becomes effective, and both united place it beyond controversy that the plaintiff once had a valid title to the girl Hannah, and that the jury could not have acted on a contrary supposition.

The second ground though not so wholly untenable as the first, does not afford a satisfactory foundation for the verdict. There was no evidence adduced of an actual transfer of the property by the plaintiff to her father; and that such alienation did occur is not a matter of necessary or just inference, even from Jared Irwin's long continued possession of the negroes, or from his exercise of a general authority over them. From the tender age of the plaintiff at the time of the gift, the possession and management of the girl Hannah necessarily devolved upon General Irwin; and that he should keep the negro and her offspring upon his plantation and exercise a general authority over them, during the whole time that his daughter remained under his paternal care as a member of his family, was entirely consistent with the ordinary course of human conduct under such circumstances, and furnishes no reasonable ground for the hypothesis of an actual transfer of the property to him; particularly when that hypothesis is at variance with the uniform admission of the plaintiff's title by the family of General Irwin, during the time that he had possession of the property. It may be thought however, that the presumption of a transfer is authorized by the fact of his having mortgaged the property. But unless she had knowledge of the mortgage, no such presumption can arise. Her antecedent title (with which his possession was not incompatible) having been established, no inference to the prejudice of her right can be legitimately drawn from any act of his, of which she was not cognizant. It was not proved that she was apprised of the mortgage at the time of its execution. The only witness who testified concerning this point, said he did not believe the existence of the mortgage was known to the neighbors and family of the mortgagor in the year 1817, and that from the situation of the plaintiff who spent much of her time from home, it was probable that she at that time knew nothing of the private transactions of her father.

But the jury, without adopting the presumption of a transfer by contract, may have based their verdict upon the third proposition. They may have supposed that the uninterrupted possession and control of the property by Jared Irwin for so long a period, together with his assumption of ownership in mortgaging the negroes to James Dickson and Co. had the effect by operation of law to divest the plaintiff of her right of property. But the only possession or enjoyment which can divest a legal title, must be adverse to, and inconsistent with the title. And even an adverse possession held during the minority of the true owner, cannot operate against his right. The mere possession then of Jared Irwin, during the minority of his daughter, even granting it to have been adverse, creates no bar to her claim. But the possession of General Irwin, was certainly not adverse in its inception. It originated in necessity and duty; and may we not find a sufficient motive and reason for its continuance in his paternal character, and in the situation of the plaintiff as a young female, residing under her father's roof, and incapable of superintending and managing the property herself? The only act of General Irwin which was necessarily adverse to his daughter's right, was the mortgage of the property to James Dickson and Co. But that act alone, considered merely as *his* act, and unsupported by any thing done on her part, could not affect her title. It could operate against her, only through the medium of her own conduct.

We have now arrived at the fourth proposition—to wit, that she had knowledge of, and assented to the mortgage, or fraudulently concealed her title from the mortgagees. Whether this ground is supported by the evidence, we have already briefly considered, and it is not necessary to resume the inquiry. The legal principle upon which it rests, is doubtless a sound one. Where a person having title to property of which he is apprised, stands by and suffers another to mortgage or sell the property, without asserting his title, or making it known to the mortgagee or purchaser, he cannot afterwards set up his claim. 1 Fonb. 163. And in such case, even infancy would be no protection, provided the minor had arrived at those years of discretion when a fraudulent intent could be reasonably imputed to him. 1 Fonb. 164. Clare v. Earl of Bedford, cited 9 Mod. 33.

The fifth and sixth propositions remain to be considered. Whatever influence the circumstances which we have already reviewed, may have had in producing the verdict, it is highly probable that the evidence in relation to the plaintiff's presence and silence at the time of the levy, together with the fact that there was no proof that she objected to the sale, or disclosed her title, had a controlling effect upon the minds of the jury. And it was certainly entitled to grave consideration. If *A.* be present when an execution is levied on his property

as the property of *B.* and does not object to the levy, or claim title in himself, a presumption arises that he has no title. But it is not an absolute and uncontrollable presumption, which, like the " *Præsumptiones juris et de jure*" of the civil law, admits of no contradiction. For notwithstanding his silence, if *A.* should afterwards come forward, and in conformity with our statutory provisions, interpose his claim, and should produce upon the trial, clear and satisfactory evidence of title in himself, which he would be permitted to do, he would of course obtain a verdict in his favor. And even if he should not interpose his claim under the statute, but on the day of sale should publicly forbid the sale, and assert his title in the hearing of the by-standers, he might afterwards institute an action against the purchaser, who could not defend himself against a clear title, by proving that the plaintiff at the time of the levy made no objection. In a doubtful case, however, such implied acquiescence in the levy, if not satisfactorily explained, would be sufficient to turn the scale against the claimant. In the present case, the only evidence applicable to this point is contained in the written examination of the officer who made the levy; and perhaps it is worthy of remark that he does not speak in positive and unqualified terms as to her presence at the levy, but simply states that he *believes* she was present. He also gives it as his mere impression that she knew the nature of the process under which he was acting. He does not say explicitly that she did not object to the levy, or that she did not assert a title to the property now claimed; but as he does state that no person forbade him to take the girl Hannah, the reasonable inference is that no claim was announced. It must be recollected however that other negroes were levied on at the same time, and that none of them were then taken away by the sheriff. We are left to mere conjecture, as to the manner in which the levy was effected. It does not appear whether the negroes were assembled in the presence of the family, so that the attention of the plaintiff must have been necessarily directed to the fact that Hannah and her children were included in the number; or whether some other method was not adopted which might have left the plaintiff uninformed as to that fact. It was the province of the jury, however, to weigh the evidence, and if they were satisfied that the plaintiff was present when the levy was made, and knew the nature and effect of the proceeding, and was apprised of the fact that Hannah and her children were included in the levy, and yet did not assert her title, it cannot be said that there was no evidence to support their conclusion. If it be conceded that the plaintiff had knowledge of the levy, it was certainly her duty either to avail herself of the statutory remedy, or on the day of sale to give such notice of her title, and of her intention to insist upon it, as would have placed bidders upon their guard. In

all such cases, an omission to do either, when the party has the means and opportunity of doing one or the other, must be regarded as a fraud upon purchasers; or as such gross *laches* as will effectually bar any future claim by the party. Although it now appears by the affidavits of Whitaker and Williamson, that the plaintiff was present at the time and place of sale, and so far from assenting to it, actually forbade it, and announced her claim, yet no such evidence was adduced on the trial. In the absence of such proof therefore there was nothing to counteract the presumption against the title of the plaintiff which may have arisen in the minds of the jury from her silence at the time of the levy; and indeed that presumption could not but derive additional strength from her failure to produce the evidence now disclosed. Under this aspect of the case, it cannot be affirmed that the verdict is against evidence. When a verdict has no foundation in the evidence, a new trial will be granted; but when there has been evidence on both sides, as it is the peculiar office of the jury to determine the relative weight of conflicting evidence, the court, although it may differ with the jury on the point of preponderance, will not disturb the verdict. "*Ad quæstiones facti non respondent judices; ad quæstiones legis non respondent juratores.*" 2 Strange, 1142. 3 Wils. 45. 1 Bl. Rep. 1. 3 John. Rep. 269. 9 John. 310. 2 Const. Rep. 452. 4 M. & S. 192. *It seems*, however, that where the verdict is glaringly against the weight of evidence, and must inevitably work injustice, a new trial may be granted. 5 Mass. 353. Berks *v.* Mason, Say. 264. Norris *v.* Freeman, 3 Wils. 39. 1 Caines' Rep. 162. 1 Const. Rep. 165. 2 Ib. 337. But excluding from our consideration the new matter disclosed in the affidavits of Whitaker and Williamson, and looking at the case only as it was presented to the jury, we cannot say that the verdict was contrary to evidence, or that it was manifestly against the weight of evidence, and clearly unjust. Hence, if there was no other ground for a new trial than the alleged opposition of the verdict to the evidence, the application could not be sustained.

It is the opinion, however, of a majority of the convention, that a new trial ought to be granted upon the ground of the newly discovered evidence, taken in connexion with certain auxiliary circumstances attendant upon the case. The materiality of the evidence, particularly of that contained in the affidavit of Williamson is obvious and striking. From the affidavit of Whitaker, we learn that the negroes were not actually present at the Court-house when they were sold, but that they were all cried at once, and knocked off *en masse* to the highest bidder, whilst they remained encamped upon the commons of the town. In disposing of the present motion, however, it is not necessary to determine whether this alleged irregularity in the sale can affect the question of right between

the parties. From the same affidavit it appears, that John Irwin who was the legal representative of Jared Irwin deceased, and who had an active agency in causing the negroes to be sold, was notified by the plaintiff on the day of sale, that she would never consent to a sale of those, which she claimed as her own ; and it seems that in reply to the remonstrance of Whitaker, he admitted the plaintiff's title at the very moment that he was engaged in promoting a measure so injurious to her interest. Much of the force of this testimony must of course depend upon the notoriety of the plaintiff's declaration to her brother ;—of Whitaker's remonstrance in her behalf,—and of John Irwin's recognition of her title. If they occurred under such circumstances of publicity as to affect the vendee with notice previous to the consummation of the purchase, it is hardly necessary to remark, that in a future trial, the testimony of Whitaker will have an important bearing upon the case. The testimony of Williamson is too explicit ; and its pertinency and force too manifest to require comment. But it has been suggested that the evidence supplied by these affidavits is only *cumulative*, and therefore not a good ground for a new trial. We admit the general rule to be, that the discovery of evidence merely cumulative in its nature does not in itself constitute a sufficient reason for granting a new trial. 8 John. 65. 15 John. 210. Though it would seem, from an observation of Livingston, J. in the case of Steinbach *v.* The Columbian In. Co., 2 Caines' Rep. 133, that the rule is not perfectly inflexible. "Cases may occur (said he) in which if great doubt exist as to the first decision, it may be proper on the discovery of further witnesses, *even to the same fact*, to open the case for a second discussion." We would be loth, however, in any case to relax the general rule, the object and tendency of which are to establish a reasonable limit to litigation. In the present case, we think, a new trial may be granted without relaxing this salutary rule. The new evidence consists of facts bearing upon a point in the case, to which no evidence whatever was adduced on the part of the plaintiff. It cannot therefore be said to be *merely cumulative*, for that term in its judicial sense implies the previous introduction of some testimony to the same point by the same party. But the fact is,—whether the plaintiff did or did not give notice of her title on the *day of sale* was a question, in reference to which, notwithstanding its importance, no testimony was introduced on either side. If the evidence now produced upon this point had been submitted to the jury, it would have given a different aspect to the case. The verdict could not then have rested upon the presumptive foundation of an acquiescence in the sale, or of a virtual fraud upon purchasers ; and if that ground had been removed, it is not improbable that the verdict would have been different. As the evidence therefore is material, as it is

not merely *cumulative*, and as its direct tendency would be to destroy those presumptions, upon which the verdict was probably based, there could be no difficulty in granting a new trial, if the plaintiff had shown that the evidence now produced could not have been had on the trial by the exercise of ordinary diligence. This has not been satisfactorily shown, and in our solicitude not to intrude upon the rule which exacts proper diligence from parties, we have doubted, whether for this deficiency, a new trial ought not to be refused. In general the objection would be insuperable, but in the present instance we are inclined to think that it is outweighed by the strong considerations in favor of a new trial, which are to be found in the general character of the case. In the language of Mr. Justice Denison, (1 Burr. 397.) " the granting a new trial or refusing it must depend upon the legal discretion of the court, guided by the nature and circumstances of the particular case, and directed with a view to the attainment of justice." The circumstances then from the united force of which we feel ourselves bound to grant a new trial may be gathered from the following condensed recapitulation.

The original title of the plaintiff was established by clear and *direct* proof. Against it, *presumptions* alone were relied on. Some of those presumptions may have been deduced from facts which were not *necessarily* inconsistent with her title. The possession of Jared Irwin in its commencement was perfectly consistent with the plaintiff's right. An adequate reason for its continuance existed in the relation of parent and child without resorting to the idea of alienation by the plaintiff, or of an adverse title in Jared Irwin. The girl Hannah was invariably acknowledged to be the property of the plaintiff by the family of Jared Irwin. There was no evidence that the plaintiff assented to, or was even apprised of the mortgage at the time of its execution. Her title was admitted by John Irwin the legal representative of Jared Irwin deceased, soon after the death of the latter, (Ware's testimony.) The evidence in relation to the levy and the plaintiff's conduct on that occasion is so indefinite, as to leave it uncertain whether she was *then* apprized of the fact that Hannah and her children were included in the levy. The property in dispute is of considerable value. There have been two opposite verdicts. The last verdict was probably founded in a great measure upon a presumed acquiescence in the sale by the plaintiff, or upon the idea of a fraudulent concealment of the title from the purchaser. The plaintiff has it now in her power to show that such presumption had no foundation in fact, and that at the time and place of sale she gave public notice of her claim.

In addition to all which, the recognition of her title by John Irwin the legal representative of Jared Irwin deceased, when the negroes were sold, may become very material if it be

shown that it occurred in the hearing of the purchaser before the sale was perfected. Without such subsidiary proof we do not pronounce upon its admissibility or effect.

The evidence in the cause having been procured by interrogatories, exists in writing. No injury to the defendant therefore can be apprehended from the possible death of witnesses.

The opportunity which the granting of a new trial will give to the plaintiff for submitting new evidence in support of her action will be equally available to the defendant for strengthening his defence; the result of which will be, that upon a reconsideration of the case, the jury would be furnished with all the light necessary to a correct decision.

Rule made absolute.